SEALED

FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

2009 JAN -7  PM 2: 26

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

| | |
|---|---|
| UNITED STATES *ex rel.,* and NANCY REUILLE, <br><br> Relator, <br><br> vs. <br><br> COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES, CORPORATION, and LUTHERAN MUSCULOSSKELETAL CENTER, LLC, d/b/a LUTHERAN HOSPITAL, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO.: 1:09-CV-

1 : 09 C V 007  RL

## COMPLAINT AND JURY DEMAND

COME NOW, Relator, Nancy Reuille, by counsel, Loren K. Allison, and

files this instant cause of action on behalf of the United States of America

against Community Health Systems Professional Services, Corp. ("CHS") and

Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital ("Lutheran")

for a violation of the Federal False Claims Act.

## BACKGROUND

1.     Nancy Reuille, Relator, is a female resident of Zanesville, Indiana, who

worked for Lutheran from 1985 to October 1, 2008. Her last position with

Lutheran was Supervisor of Case Management.

2.     Defendant, CHS, is a corporation doing business in the State of Indiana

and in Fort Wayne, Allen County, Indiana, as Lutheran Health Network, d/b/a

Lutheran Hospital, St. Joseph Hospital, Bluffton Regional Medical Center,

Dukes Memorial Hospital, Dupont Hospital, Kosciusko Community Hospital,

Redimed & Rehabilitation Hospital of Fort Wayne. CHS supervises the activities

of such agents and instrumentalities throughout the United States.

3.      The False Claims Act, originally enacted in 1863 during the Civil War,

was substantially amended by the False Claims Amendments Act of 1986 and

signed into law on October 17, 1986.  Congress enacted these amendments to

enhance the Government's ability to recover losses sustained as a result of

fraud against the United States and to provide a private cause of action for the

protection of employees who act in furtherance of the purposes of the Act.

Congress acted after finding that fraud in federal programs and procurement is

pervasive and that the False Claims Act, which Congress characterized as

procurement is pervasive and that the False Claims Act, which Congress

characterized as the primary tool for combating fraud in government

contracting, was in need of modernization.

4.      The Act provides that any person who knowingly submits a false or

fraudulent claim to the Government for payment or approval is liable for a civil

penalty of up to $10,000.00 for each such claim, plus three times the amount

of the damages sustained by the Government, and attorneys' fees.  The Act

allows any person having information regarding a false or fraudulent claim

-2-

against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery. The complaint is to be filed under seal for 60 days (without service on the defendant during such 60 day period) to enable the Government (a) to conduct its own investigation without the defendants' knowledge and (b) to determine whether to join the action. The Act further provides that any employee who is subjected to retaliation by an employer for lawful actions taken in furtherance of an action under the Act is entitled to all relief necessary to make the employee whole, including but not limited to reinstatement with full seniority, two times the amount of back pay, interest on back pay, special damages, costs and reasonable attorneys' fees.

5.    This dispute arises under the Federal Medicare program administered by the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA). The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. § 1395( c). CMS is the agency of the Department of Health and Human Services responsible for administering the Medicare program. CMS's payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under medicare law, regulations and interpretive guidelines published by CMS. *See*: 42 U.S.C. § 1395(h), C.F.R. §

-3-

413.20-413.24.

6.     Based on these provisions, Reuille seeks to recover damages and civil penalties arising from defendant's presentation of false claims to the United States Government.

FACTS

7.     Relator was an employee of Lutheran Hospital of Indiana for twenty-three (23) years, from 1985 until October 1, 2008, as a registered nurse with a B.S.N. in Nursing.  In 1997, she entered management as the MDS Coordinator for a newly formed Transitional Care Unit which required an extensive knowledge of Medicare rules and regulations for nursing homes.  This unit was closed in 2000 due to financial considerations.  Ms. Reuille applied for and accepted the supervisory position of Supervisor of Case Management in January of 2000.  In this position she was responsible for supervising ten (10) Case Managers which reviewed all of the Medicare, Medicaid, private insurance, and self-pay medical records of hospitalized patients on a daily basis.  The Relator was familiar with Medicare "medical necessity" criteria for hospitals and she designed and implemented review forms and auditing tools used by the Case Management Department.

8.     Reuille was recruited by the hospital's billing office to be the Case Management, nursing and medical denial specialist who worked to reverse denials of coverage related to clinical/medical criteria and billing problems.  In

-4-

this position, she issued medical appeals based on medical record audits and clarification of information with the Lutheran Billing Department. The Relator also worked closely with the Lutheran Registration Department in the process of rectifying errors on denied accounts caused by incorrect account admission data. She directly contacted the insurance companies, Medicare and Medicaid concerning issues of medical appropriateness and/or payment and developed a unique skill set. Familiar with all aspects of patient account auditing, Reuille was able to follow a patient's claim from admission to discharge, noting the correctness of the "patient-type" whether Inpatient, Outpatient, or 23 hour Observation, verifying medical necessity appropriateness, verifying that the bill correctly matched the physician's written patient-type order (Inpatient, Outpatient or 23 Hour Observation) and was able to check the bills to verify that charges matched actual services received *i.e.* correctly registered, correctly followed physician orders, met "medical necessity", and billed as ordered.

9.      As Supervisor of Case Management, Reuille was responsible for several audits of financial gravity. Among the audits was the Medicare "One-Day Stay" audit, a "23 Hour observation" length of stay audit, and an "Impatient Only" procedure audit. In her job capacity, Reuille assisted Lutheran Hospital to monitor the medical necessity and accurate processing of patient accounts. Under her supervision, the Case Managers reviewed the hospital's current and retrospective patient charts daily to ensure that the care prescribed, the

demographic and clinical record information, and the billing information met the level of care and authorization guidelines for authorization and payment as set by private insurances, Medicare, and Medicaid.

Over the years, Reuille developed a comprehensive knowledge of all aspects of patient case management. From the years of 2000 to 2008, given her expertise, Reuille along in conjunction with her immediate supervisor, Division Director Ted Weimerskirch attempted to compel hospital divisions to smoothly process accounts and to work together to correct processes that were working ineffectively and therefore, causing multiple processing errors. Reuille noted and her supervisor acknowledged that Lutheran Hospital had no coordination of process and/or cooperation between Administration, Compliance, the Registration Department, the Clinical Review/Case Management Department, and the Billing Department. Any attempts to coordinate and improve the process resulted in each individual area responding with a general "that's not my area-not my responsibility".

10.     As a consequence, on March 24, 2000, Health Care Excel, on behalf of the Indiana Medicaid program, completed an on-site audit at Lutheran Hospital based on a review of 1997 accounts related to the "medical necessity" of claims which compared Lutheran's billing and practice patterns to the billing and practice patterns for the providers in the same geographic area and specialty. Deficiencies leading to overpayment and mis-utilization were identified on

-6-

multiple accounts and a recoupment of $177,000.00 was requested under Indiana Health Coverage Program criteria (405 IAC 1-1-5). In a majority of the recouped accounts the inappropriate level of care and inpatient admission rather then observation status were the reasons for overpayment of the accounts. "Problems" noted, *included incorrect admit date and discharge dates that were billed, incorrect discharge codes, multiple treatment rooms were billed for the same date of service, inappropriate short inpatient stays and failure to meet inpatient medical necessity of short stays versus billing as 23 Hour observation status.*

Reuille contends that these same "errors" have occurred routinely during her years of employment in the Case Management Department. Any attempts to initiate corrective action have been met with resistance since no individual area has been directed to accept responsibility. The process at Lutheran Hospital is purposely "ineffective" and the result has been discrepancies that stem from the medical records purposely not substantiating the billed charges. Reuille contends that "mis-utilization" and overbilling have cost Medicare, Medicaid, and private insurance companies millions of dollars in overpayment due to the many deficiencies in Lutheran Hospital's purposely deficient system.

As a consequence, Reuille cites two issues that clearly demonstrate a pattern of intentional abuse of the Medicare system. The two issues for which Reuille seeks relief are:

-7-

a.    False "23 hour observation" billing after outpatient surgeries and
      procedures; notably excessive hours of observation care being
      reported which do not correlate with actual dates and times of
      service.

b.    Intentional assignment of "inpatient" status to "One-Day Stays"
      accounts to allow Lutheran to fraudulently receive "inpatient"
      reimbursement on cases that clearly do not meet "inpatient"
      intensity of service or severity of illness, per established Medicare
      criteria.

A.    Inaccurate "23 Hour Observation" billing after outpatient surgeries
      and procedures.

11.   *Lutheran Hospital is assigning excessive hours of observation care, and
billing for time when the patient is not in the facility.  The dates and times of
service do not correlate with actual dates and times of the actual observation
services.*

12.   While involved with precertification work at Lutheran which required
daily monitoring of patient charts (medical records), Reuille noticed recurring
claim issues regarding inaccurate processing and falsification of Medicare "23
Hours Observation" accounts.  Reuille has first hand knowledge that Lutheran
Hospital is falsifying the dates and times of "23 Hour Observation" services
which were supplied to patients who underwent "Outpatient" surgeries and

-8-

procedures.  These were accounts in which patients stayed past normal recovery time as "23 hour observation" to receive additional monitoring, rather then going directly home after surgery.  Incorrect quantities of "observation" hours are being reported on a UB92 (Medicare bill).

13.    By definition "23 HOUR OBSERVATION SERVICES" are those outpatient services furnished by a hospital on the hospital premises, including use of a bed and periodic monitoring by a hospital's nursing or other staff, which are reasonable and necessary to evaluate an outpatient's condition or determine the need for possible admission of the hospital as an "inpatient" (Medicare Claims Processing Manual, Pub. 100-4, Chapt. 4, sections 290-290.6). According to Medicare studies, their need for "observation" services after outpatient procedures and surgeries is that they can usually be expected to discharge from the facility immediately after the normal recovery period not requiring "observation" saving the federal government money.  However, if there is a medical complication which the physician documents, the patient who needs further monitoring to determine if they are ready for discharge or if they require "inpatient" hospitalization can be placed into "23 hour observation" status.  This status is less costly to the medicare system since an "inpatient" room and board charge is not assigned to an "observation" claim.  Rather, the postoperative "observation" services have been "bundled or packaged" with the costs of the outpatient surgery and recovery room charges into a procedural

ambulatory payment classification (APC) since April 2002. Medicare utilizes a set of "medical necessity" criteria entitled InterQual to determine whether "observation" or "inpatient" status is appropriate. This requires the physician to monitor and document the patient's medical condition in the recovery room and after an adequate recovery time, to determine the patient's clinical needs and decide whether to discharge the patient or admit them as an "inpatient". If the physician needs further time after normal recovery to determine this clinical path, they can use "23 hour observation" status to do so as long as the patient's medical condition dictates the care. To do this, he writes and dates an order for "23 hour observation". This timed and dated order indicates the beginning of "23 hour observation" billing and can never be determined prior to the surgery and recovery period. "23 hour observation" charges are calculated and reported by the hour from the time the physician writes the "observation" order after recovery until the time the physician discharges the patient or converts their status to "inpatient" because of their medical condition.

14.     The express purpose of "23 hour observation" monitoring is a "decision time" in which the patient with a postoperative complication, after normal 4-6 hour recovery, is monitored and treated with nursing care. This time gives the physician a period in which to decide if the patient will be medically stable to discharge after "observation" or whether the patient's condition medically indicates a need for further treatment as an "inpatient".

-10-

15.    Reuille noted that the admission time to the Lutheran hospital for many surgical services per the patient's "facesheet" (initial page of their chart) on their medical record did not follow the "normal and customary" surgical procedure admission and recovery times. Facesheets indicated that patients were being admitted between midnight and 5:00 o'clock a.m. into 23 hour observation status. Physicians as a practice, however, do not bring a patient into the hospital for a "scheduled" outpatient surgery in the middle of the night. Patients normally appear for surgery between 5:00 o'clock a.m. and midafternoon. Reuille began to suspect negligence, at a minimum, in the processing of accounts. She suspected "observation" was being reported before surgery and recovery and before admission to the hospital. She began to audit these accounts per her supervisor's express instruction. The auditing criteria she used was a) "23 hour observation" status per the physicians order and established Medicare criteria and b) admission times between midnight and 11:00 o'clock a.m. Reuille initially tried to correct these cases individually as they were found, believing they were "flukes" in the system. However, these cases continued and increased in frequency so she gathered some example cases. Reuille more closely audited these medical records containing these unusual times to determine c) the actual time the patient arrived for surgery, d) the time they went to the recovery room after surgery, e) the time the physician wrote the "23 hour observation" order, f) the time the patient arrived on the

-11-

nursing unit from the Recovery Room, and g) she reviewed the patient's bill noting the quantity of observation minutes/hours being charged on these accounts.

16.    "23 hour observation" claims are calculated for reporting on the UB92 by the minute the patient is in a bed under "23 hour observation status based on the time the physician writes the "23 hour observation" order on the chart in the Recovery Room, postoperatively, having made a decision after a normal recovery period that the patient is not ready or safe to go home medically. It is based on a documented medical complication altering the usual course of outpatient surgical progress; *i.e.* discharge. On the other hand, "inpatient" accounts are billed a single daily bed charge based on whether the bed assignment is to a medical or intensive care bed, etc. and the patient is charged a set amount per day regardless of the number of hours the patient is in the bed from midnight to midnight. Prior to 2002, Medicare allowed a separate payment for each hour of observation care a patient received. In 2002 the rules changed and "observation" services were paid as a "packaged" APC (ambulatory payment classification)  procedure amount for post-surgical observation but there continues to be payment for observation built into the "package" with surgery, recovery room and other miscellaneous charges. "23 hour observation" charges are required to be reported accurately on the UB92 (Medicare bill) even though reimbursement is packaged.  Per Reuille's

-12-

communication with a Health Insurance Specialist and counsel for CMS.

17.     Reuille began checking the bills and found that the number of minutes
being reported on these accounts was not calculated from the time the surgeon
wrote the "23 hour observation" order after recovery. *Not only was this time not
"postoperative and after recovery" but it was often a time in the middle of the
night when the patient was not even physically in the hospital. This false
reporting violates Medicare guidelines and results in excessive billing and
fraudulent reporting. The implication of billing for erroneous times and time the
patient was not in the facility results in claims reporting an estimated 3-10 excess
"observation" hours per claim. This practice has been documented for three (3)
years. (All payors are receiving these inaccurate claims, including Medicaid,
Medicare and private insurance companies).*

Reuille took examples of these accounts to administrator Karen Springer,
Chief Operating Officer (C.O.O.). *The response Reuille received from Springer
indicated that she was aware of the problem but placed the blame for false claims
upon the surgeons failing to follow the Medicare guidelines for writing the "23
hour observation" orders after recovery, which was, again, Lutheran's obligation
to manage.* Reuille, after meeting with intransigence from Springer voiced her
disagreement. She believed the physicians were correctly ordering the start of
observation but the hospital was reporting no record. She reviewed these
accounts again verifying with Springer that the problem was not the

physician's orders for they were indeed written at a time after surgery, not prior to surgery. After relating as much to Springer again, Reuille continued to monitor accounts with these odd times to see if any correction of this error was implemented. No correction occurred, resulting in false claims being submitted with the COO's express knowledge. Months later, in the course of attempting to correct one of these individual accounts, Reuille met with Ms. Julie Nankervis, the Supervisor of the Registration Department. Correction of patient admission registration information is managed through the Lutheran Hospital Registration Department as well as through the Billing department if a patient has already been discharged from the hospital. *Nankervis acknowledged the problem but did not indicate any intention of follow-up on the issue and none was undertaken since the "errors" continued.* Reuille continued to audit for these false records and these inaccurate dates and times were still occurring as of the date of Reuille's constructive discharge from employment on October 1, 2008.

The financial impact of over reporting "23 hour observation" time varies according to the payor responsible for reimbursement. For private insurances there is a great impact since they continue to encourage the use of "23 hour observation" as does Medicaid. Private insurances reimburse these services according to the method dictated in the contracts negotiated with Lutheran Hospital and "observation" rules are gauged by Medicare's guidelines. The

-14-

impact on payment by Medicare and Medicaid is more difficult to determine. These cases audited are "short stays" meeting the "observation" criteria per the Department of Health and Human Services (DHHS) Centers for Medicare and Medicaid Services (CMS, Pub. 100-2 Medicare Benefit Policy). The 2002 rule has packaged "observation" services with the surgical procedure and recovery and additional "observation" time packaged into the surgical APC would increase the packaged cost, resulting in an overpayment to Lutheran and to Medicare's detriment.

18.     Reuille contends that it is fraudulent to misrepresent the date/times of "observation" services especially since thousands of accounts with post-surgical and post-procedure "23 hour observation" were and continue to be falsely reported.

B.     Medicare "One Day Stays"

19.     In 2001, as Supervisor of Case Management and under the direct supervision of Division Director Weimerskirch, Reuille began a proactive Medicare audit at Lutheran Hospital of Medicare "One-Day Stays". The focus of the audit was accounts in which the patient had a written order by the physician to be an "inpatient" but the length of the hospital stay was less than one day. These hospital visits were being processed by Lutheran as "inpatient" rather than the more "medically necessary" and less costly patient-admission type, "23 hours observation". The audit was initiated in response to

-15-

information received by Weimerskirch indicating that the Office of the Inspector

General (OIG) was investigating "One-Day Stays". The OIG suspected Medicare

overpayment. Their records indicated that 10% of all Medicare patients were

improperly admitted and discharged on the same day and were admitted as

"inpatients". The OIG suspected nationwide Medicare overpayment of billions

of dollars related to these hospitalizations failing to meet "inpatient" medical

criteria. Since "23 hour observation" was a valid outpatient status for one day

stays, OIG questioned if "observation' was not a more appropriate billing status

based on medical criteria. The very fact that the patient was able to discharge

on the same day would indicate a lesser intensity of service required than

"inpatient" services. Weimerskirch believed that OIG/Medicare audits would

soon follow the report. Therefore, Weimerskirch, with the approval of Steve

Carroll, Chief Financial Officer (C.F.O.) initiated an audit to correct any such

errors at Lutheran. Reuille was asked to be the R.N. Case Management

Auditor for Medicare "One-Day Stays" and her results were reported to

Weimerskirch on a monthly basis. Cases not meeting "inpatient" criteria were

forwarded to Carroll for authorization to "write-off" account charges since

Medicare rules prohibited billing care that did not met Medicare necessity as

"inpatient" or converting the claims back to "23 hour observation" status after

discharge from the facility. Lutheran was aware that, billing for medically

unnecessary services was fraudulent.

20.     Health Care Excel followed-up with an HPNP (Hospital Payment

Monitoring Program) audit completed by Medicare QIO staff of "One-Day Stays"

in August of 2006. They requested 22 charts dated August 1, 2005 - October

31, 2005 to establish a baseline. The goal of HPNP was to reduce unnecessary

"inpatient" admissions for "One-Day Stays" related to incorrect coding, non-

covered, insufficiently documented, or "medically unnecessary". Sixteen of the

twenty-two charts failed abstraction resulting in a 73% error rate of

inappropriate inpatient admissions of "One-Day Stays". A further audit of 10

charts dated December, 2005 to January, 2006 failed abstraction with a

continuing error rate of 54% of inappropriate admissions. The major finding of

this audit was that most stays failing the audit did not meet the medical

criteria for "inpatient" status and would have been more appropriate as "23

hour observation", and hence "cheaper".

21.     Reuille began her audit by generating a list of Medicare recipient records

that met certain audit criteria, *i.e.* patients that 1) were admitted and

discharged within one day; 2) the patient admission type was "inpatient"; and

3) patients who expired were eliminated from the audit. As a nurse auditor,

Reuille then reviewed these records per InterQual Medical Criteria, (the

established standard) used by Medicare to determine if the services ordered as

"inpatient" by the physician and provided by Lutheran for 24 hours of less, met

inpatient "medical necessity" criteria. The audit revealed a significant

-17-

percentage of account <u>did not meet</u> "inpatient" criteria. For example in the last quarter of 2001, this audit at Lutheran Hospital indicated that 19% of the Medicare admissions fell into the "one-day stay" category. Of this percentage, 13% of these stays did not meet medical criteria for "inpatient" billing but should have been ordered by the physician as "23 hour observation". Since Health Care Excel (Medicare) only allows for a 5% error rate, this audit revealed an existent problem at Lutheran. Reuille and Weimerskirch began working with physicians by phone, per meetings, and per written communication to attempt to encourage compliance with Medicare's guidelines for short stays. They educated the physicians that they could use "23 hour observation" or "outpatient" status when "inpatient" medical criteria were not present. The dollar amounts written off by the hospital during these auditing years (by Reuille) varied but averaged $50,000.00 per month.

22. As a consequence, of her efforts, Reuille was removed from this auditing position in September of 2006, a move directly related to the significant financial implication of these write-offs to the hospital's profit. The new Supervisor of Case Management, Rebecca Miller, assumed these audits until October 2007 upon Ms. Miller's resignation, Sue Heckley, R.N. took over the audits and completed them monthly until CHS (Community Health Systems) purchased and took over Lutheran Hospital in December 2007.

23. CHS abruptly discontinued the proactive Medicare "One-Day Stay"

-18-

audits altogether stating that it was not part of their protocol. CHS does not encourage 23 Hour Observation status regardless of the length of stay. Per Bill McCray, head of parent company CHS Case Management, "inpatient" status is justified by the CHS criteria set, which conflicts with CMS guidelines. Immediately prior to the takeover by CHS, Case Manager Heckley was identifying many inappropriate "inpatient" short stays and the write-offs varied from $50,000.00 to $170,000.00 per month, a monetary loss CHS would not permit.

24. Reuille contends that there has been a dramatic decrease in the volume of "23 Hour Observation" cases and a dramatic increase in the number of "inpatient" "one-day hospitalizations under the new owner, CHS, for Lutheran's benefit. McCray visited Lutheran in January 2008, and met with his new Case Managers. He told them that CHS has an intense focus on case management and that they would all require education on CHS medical criteria contained in the corporation's "Blue Book". Reuille reviewed this book and compared it with InterQual which Medicare uses and which Triad Hospitals, the former hospital owners used. She found the book *exceptionally simplistic* and *nonspecific* and *according to the Blue Book virtually any case could be construed as meeting "inpatient" medical criteria to detriment of the federal government*. By illustrative example, if anywhere in a chest pain patient's past medical history they had a heart attack or heart disease history it was deemed appropriate per the Blue

Book for "inpatient" care simply based on this past history, without significant

current symptoms or treatment. According to InterQual criteria, that same

patient would be determined to be appropriate for "observation" for a single day

to rule out a heart attack and then the physician could determine if further

inpatient care or a discharge would be appropriate. Under the Blue Book

criteria, CHS would receive payment for a one-day inpatient DRG (Diagnostic

Related Group - a payment classification) stay for this case. Considering the

large number of Lutheran one-day stays this correlates to excessive overbilling

of stays for which there was a less expensive level of care available. This

practice continued as of the date of Reuille's constructive discharge.

25.    A former case manager and a current director learned in an early 2008

meeting conducted by McCray, that thereafter, Lutheran was to "manage up"

diagnostic related groups. Prior to CHS, when a elderly patient was released

from Lutheran to facilities such as nursing homes, long term care facilities or

hospice, the DRG payment was split between Lutheran and the respective

facility receiving the former Lutheran patient. (The portion of the payment is

based on the time spent in each respective facility). McCray consequently,

mandated to CHS case managers that they "manage up" for (manipulate

Medicare rules) these DRG's by retaining the patient at Lutheran for an extra

day or more contending that the elderly are perpetually in need of additional

hydration or physical therapy - thus permitting Lutheran to recoup the

-20-

majority of transfer DRG payment - thus increasing reimbursement to the

hospital by delaying the patient's discharge to the waiting facility.  This practice

violates the "medical necessity" criteria established by Medicare, and

demonstrates that CHS is engaging in a concerted effort to, silently or

otherwise, file false claims.  McCray informed physicians, too, that it is CHS

policy to appeal denials by Medicare of "one day stays" as inappropriate

"inpatient" hospitalizations rather that to encourage voluntarily assignment of

a lower level of care and reimbursement, *i.e.* "23 hour observation".

26.     Questioning an increasing trend making all patients "inpatient" was how

Reuille learned that CHS was training the Case Management staff in educating

the physicians to utilize CHS inpatient status to increase revenue.  Reuille

concluded that reasonable minds can presume any "blame" for such "errors" is

placed on physicians who are independent contractors and not Lutheran

employees.

27.     Within a month of purchase of CHS, Reuille noted the number of "23

Hour Observation" admissions began to decrease and the cases previously seen

as "observation" were being admitted as "inpatient".  Reuille, upon being

removed as auditor in September, 2006 was retained in the position of

Supervisor of Precertification, with a staff of one, still in the Case Management

Department, but not as an active "manage" she received a copy of all admission

facesheets for the previous day the following morning.  Viewing both "inpatient"

and "23 Hour Observation" facesheets, Reuille witnessed a dramatic increase in
"inpatient" cases daily as well as dramatic decrease in the number of
"observation" facesheets, while total number of daily cases remained
approximately the same.  Reuille and her staff were responsible for reporting
the clinical information to private insurance companies, managed Medicare
companies, and managed Medicaid carriers to obtain medical authorization
numbers for use in billing these accounts.  Starting in February 2008, the
workload of handling "inpatient" accounts versus "23 Hour Observation"
accounts reversed itself from the pattern of previous years where mostly
"observation" status had to be managed by calling to see if precertification was
required.  "Inpatient" cases almost always required precertification, so Reuille
noted a dramatic increase in her area's caseload of "inpatient" precertification
of short stays.  When Reuille questioned the Case managers about the reason a
short stay case that was customarily "observation" was now being presented as
"inpatient", she was told by the Case managers, "that is how CHS insists it be
done".  CHS is openly dictating the use of "inpatient" status for these short,
one-day stays.

28.    A 2002 Medicare guideline change stopped separate reimbursement for
"23 Hour Observation" care except for the diagnoses of chest pain, congestive
heart failure, and asthma.  Medicare Claims Processing Manual, Pub. 100-4,
Chpt. 4, sections 290-290.6.  Prior to April 2002, Medicare allowed a separate

-22-

per hour reimbursement for each hour a patient was in "observation" status starting at the time the physician wrote the "admit to 23 hour observation" order until he wrote the "discharge" order releasing the patient from hospitalization. The use of "observation" status has not been eliminated, the reimbursement has simply been "bundled" with the remainder of the charges for the stay rather than having a separate "room charge" reimbursement for the hours of "observation" care except for the three diagnoses already cited. A previously acceptable payment for "observation" is now an issue of decreasing revenue for hospitals. As mentioned previously, CHS has responded to this threat to revenue by setting internal guidelines that mandate the use of the more lucrative "inpatient" status, as opposed to Medicare's evaluation standard of "medically necessary".

29.    In summary:

      a.    Dating back to 2000, internal proactive audits of "One-Day" inpatient stays resulted in thousands of dollars in write-offs for lack of medical necessity for "inpatient" care;

      b.    Reuille and Weimerskirch, engaged in physician education in an attempt to help physician's understand that 23 hour observation status was more appropriate for the majority of one-day hospitalizations. The physicians understood and began to order this less costly method of treatment;

    c.     In 2002 Medicare changed the payment guidelines for 23 hour observation status. No longer was a separate payment made for the hours in observation status, rather a bundled payment was allowed for total services during the stay which included an amount for observation care. The frequently used "observation" status became a negative revenue producer;

    d.     Unwilling to lose the revenue, CHS began changing the case management of short stay cases, educating physicians and Case Managers to use "inpatient" status rather than "23 hour observation" in direct opposition to the training given to physician's in earlier years. CHS justified this by the use of questionable medical criteria they devised and different than that established by Medicare, *i.e.* Blue Book v. InterQual criteria.

30.    Reuille resigned from Lutheran Hospital on October 1, 2008 believing knowledge of and participation in, as Medicare and private insurance companies. Having already addressed these issues without positive resolution at Lutheran, Reuille now seeks redress.

C.    RETALIATION

31.    In early 2006 there was a department reorganization in Case Management and Reuille was removed from the responsibility of direct supervision of the Case Managers. She retained the function of chart auditor

-24-

under the direct supervision of Weimerskirch, Division Director of Social
Services. She also assumed responsibility for the portion of the Case
Management Department which was responsible for precertification of all
hospitalizations. This required contacting payors, whether private insurance,
managed Medicare, managed Medicaid, etc. with clinical information and
obtaining authorizations to submit with the patient's claims.

32.     In September, 2006 Reuille was removed from the position of "chart
auditor" at the directive of Lutheran Administration over and above
Weimerskirch. She was given the directive to stop auditing accounts by Mary
Ellen Brill, Division Director of Case Management and Quality Improvement,
under the authority of Steve Carroll, Chief Financial Officer of Lutheran
Hospital. The Relator asserts that her removal from this job was directly related
to financial considerations, *i.e.* the writing off of thousands of dollars she
identified through her audit of Medicare "One Day Stays" because the audits
were identifying many inappropriate inpatient "one day hospitalizations" per
InterQual medical criteria.

33.     Frustrated and exhausting all internal administrative remedies, Reuille
filed a charge with the Equal Employment Opportunity Commission (EEOC) on
June 26, 2007, EC-0101-A7-24D-2007-00328, alleging age discrimination and
"retaliation". In her charge, she addressed the problems she was enduring in
the workplace:

-25-

"I have been satisfactorily performing my job duties for my employer since January of 1985. In September of 2006 my job duties were redefined and the bulk of my responsibilities were given to a younger less experienced employee. During a departmental meeting in November of 2006, this same employee was announced a supervisor over myself and another case management supervisor as part of a restructuring plan for our department. Despite my years of experience in this type of position, I was excluded from consideration for this position. Immediately following this meeting I wrote a grievance letter to the Human Resource Department protesting what I believe to be an act of age discrimination on the part of the Division Director of Quality Services. Since that time, I have been excluded from departmental supervisor meetings and my job duties have been reduced to that of a phone nurse with very little supervisory authority. Additionally, the Division Director of Quality Services has stopped communication with me even though she is one of my supervisors. Recently, this position has been vacated and posted on our electronic hospital notice-board and I applied for it. I have not been contacted about this position and immediately after I applied, the posting was taken down."

34.    On September 30, 2008, the EEOC issued Reuille a "right to sue" letter and on October 1, 2008, she handed the Division Director of Case Management, Liz Malmstrom her notice of intention to resign due to "intolerable work conditions" and based upon "a good faith belief that Lutheran Hospital of Indiana is knowingly and intentionally engaging in fraud". Per Lutheran Hospital protocol and the employee handbook, she provided the Defendants more than three (3) weeks notice of her intention to resign 31 days thereafter. Ex. "A".

35.    Abruptly, the same day after turning her notice in, she was asked to leave the facility, thus ending her active employment relationship that

same day.

COUNT I

VIOLATION OF THE FALSE CLAIMS ACT

36.     Paragraphs 1-35 are hereinafter realleged and incorporated by reference.

37.     31 U.S.C. 3729(a)(7) imposes liability upon any person who "knowingly

makes, uses or causes to be made or used, a false record or statement to

conceal, avoid, or decrease an obligation to pay or transmit money or property

to the Government".

38.     When a physician orders that a patient be placed under observation care,

the patient's status is that of an outpatient.  Such observation services are

covered only when provided by the order of a physician or another individual

authorized by state licensure law and hospital staff bylaws to admit patients to

the hospital or to order outpatient tests.  "In the majority of cases, the decision

whether to discharge a patient from the hospital following resolution of the

reason for the observation care or to admit the patient as an inpatient can be

made in less than 48 hours, usually in less than 24 hours."  Medicare Benefit

Policy Manual, Chpt. 6 - Hospital Services Covered Under Part B, Rev. 90.06-

19-08, 20.6, A.  "Outpatient Services Defined".

39.     All hospital observation services, regardless of the duration of the

observation care, "that are medically and reasonably necessary" are covered by

Medicare, based on hospital observation service, per hour.  _Id_. At B,  "Coverage

-27-

of Outpatient Observation Services".

40.     If the provider determines that the item or service meets the definition of

observation services or would otherwise be covered, then it must decide

whether the item or service is "reasonable and necessary" for Medicare or the

beneficiary to pay for. *Otherwise, the provider may be held liable for the cost of*

*the item or service. Id.* at C, "Services Not Covered by Medicare and

Notification To the Beneficiary", emphasis added. *See*: also, Medicare Claims

Processing Manual, Pub. 100-4, Chpt. 4, Sections 290-290.6.

41.     Lutheran has intentionally engaged in an orchestration to violate OIG

Supplemental Compliance Program Guidance for Hospitals (Jan. 2005) with its

unique "Blue Book" methodology and misinstruction to physicians concerning

"One Day Stays".

42.     That document instructs hospitals that a compliance risk exists since

OIG is monitoring whether hospitals will attempt to circumvent the hospital

outpatient payment system and encourages hospitals to become familiar with

CMS policies.  In December of 2005, CMS issued a Hospital Payment

Monitoring Program (HPMP) Compliance Workbook replete with Standards,

Instructions, Codes, Checklists, Audit Tools, Fact Sheets, Utilization Strategies,

Status Guides, and websites to ensure hospital compliance with CMS policy.

43.     Moreover, that Compliance Workbook is Chpt 8 - Part B - "Remedying

Harm From Criminal Conduct And Effective Compliance And Ethics Program"

from the 2004 Federal Sentencing Guidelines.  Those guidelines clearly outline the need for organizations to: " 1) exercise due diligence to prevent and detect criminal conduct... 2) otherwise promote an organizational cultures that encourages ethical conduct and a commitment to compliance with the law...".

44.    By not reporting nor correcting these problems with "23 hour observations" and "one day stays" which were not "medically necessary", CHS and Lutheran's silence was a false statement "to cancel, avoid, or decrease an obligation to pay or transmit money or properly to the Government" in violation of Section (a)(7).

## COUNT II

## VIOLATION OF 31 U.S.C. SECTION 3730(h) - WRONGFUL DISCHARGE

45.    Paragraphs 1-44 are hereinafter realleged and incorporated by reference.

46.    31 U.S.C. Section 3730(h) states in pertinent part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of the lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed, or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

47.    To make a *prima facie* case for retaliatory discharge under 3730(h) in most jurisdictions, the Relator must show the following: (1) that she took acts in furtherance of a *qui tam* suit, *i.e.* engaged in protected activity, (2) that her employer knew of the acts, and (3) that her employer discharged her as a result

-29-

of these acts.

48.    Reuille engaged in protected activity by repeatedly advising her supervisors that she believed that Lutheran had violated the law, by not appropriately addressing the problems associated with "23 Hour Observations" and "One Day Stays".

49.    Reuille's supervisors and CHS and Lutheran operating management were aware of her concerns but took no action to remedy the ongoing filing of false claims.

50.    On the date Reuille announced her constructive discharge to Lutheran and her intention to remain working for 30 more days to ensure a smooth transition of her duties, she was escorted from the building without explanation, though she was paid for the month of October, 2008.

51.    Realizing the implications of what the hospital had done in light of the contents of Reuille's letter of resignation, during the week of November 17, 2008, Lutheran's Vice President of Human Resources contacted Reuille as she sought COBRA continuation coverage and (after filing for unemployment compensation insurance), informed her that there was "confusion" over her resignation, and that she remains on the hospital's payroll and is still covered by the Lutheran health care plan.

52.    *Reuille was also told to have her undersigned counsel contact CHS corporate counsel to clear the matter up, return to work, and re-relate to Lutheran*

-30-

*her concerns concerning fraudulent conduct which prompted her resignation, and*
*sign a document that she will not engage in "whistle blower" activity.*

53.    Moreover, Lutheran has sent Reuille two (2) paychecks for the month of
November along with correspondence which stated "this is a check-please
cash". Reuille has not accepted the checks and as of this date is reminding
Lutheran that she resigned on October 1, 2008, that her resignation was
"accepted" by Malmstrom on that date, and is returning the checks.

54.    In any event, the timing of her discharge, notable in light of failed EEOC
settlement efforts a day prior thereto, demonstrates that her discharge was
motivated by illegal animus prohibited by 31 U.S.C. 3730(h).

55.    As a result of this discharge and not opting for re-employment, Reuille
has sustained a loss of wages, emotional distress, and embarrassment.

<u>PRAYER</u>

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.    The Defendants cease and desist from violating 31 U.S.C. 3729-32;

2.    That this Court enter judgment against the Defendants in an
amount equal to three times the amount of damages the United
States Government has sustained because of Defendants' actions,
plus a civil penalty of not less than $5,000.00 and not more than
$10,000.00 for each violation of 31 U.S.C. § 3729-32;

3.    That Relator be awarded the maximum amount allowed pursuant

-31-

to § 3730(d) of the False Claims Act.

4.    That this Court enter judgment against Defendants pursuant to 31 U.S.C. § 3730(h) in an amount equal to two times Relator's accrued back pay, as of the date of entry of judgment, together with interest thereon, plus full damages for Relator's mental anguish, suffering and humiliation; that such judgment award Reuille full damages for future lost wages and benefits;

5.    That Relator be awarded all costs and expenses of this action, including attorneys' fees; and

6.    That Relator recover such other relief as the Court deems just and proper.

## DISCLOSURE STATEMENT

I, Nancy Reuille, swear and affirm under the penalties of perjury that the above-foregoing statements are true, accurate and complete.

Nancy Reuille

Nancy Reuille

-32-

Respectfully submitted,

Loren K. Allison, #10486-98
126 W. Columbia St., Ste. 300
Fort Wayne, IN 46802
Tel:   260.407.0040
Fax:  260.407.0039

ATTORNEY FOR RELATOR